IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CODE LASTER,                        )
                                    )
                Plaintiff,          )      **CIVIL ACTION**
                                    )
v.                                  )      No.  06-3339-MLB
                                    )
DAVID R. MCKUNE,                    )
                                    )
                Defendant.          )
_____)

<u>**MEMORANDUM AND ORDER**</u>

**I.  INTRODUCTION**

    This case comes before the court on petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.)  The matter has been fully briefed and is ripe for decision. (Docs. 7, 11.)  The application is DENIED for reasons set forth herein.

    Petitioner was convicted of first-degree premeditated murder following a jury trial and sentenced to life in prison without the possibility of parole for twenty-five years.  In a federal habeas proceeding, the state court's factual findings are presumed correct and petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Petitioner does not challenge the state court's findings.  Accordingly, the court incorporates the Kansas Supreme Court's version of the facts:[1]

    On August 23, 1996, Paul Moore died of multiple gunshot

_____

    [1] These facts were taken from the Kansas Supreme Court's decision in <u>State v. Harris</u>, 266 Kan. 270, 970 P.2d 519 (1998).  Since Harris and petitioner were co-defendants, the Kansas Supreme Court stated that the underlying facts pertaining to petitioner were set forth in <u>Harris</u> and it would not restate those facts in <u>State v. Laster</u>, No. 97-79463 at 4-10 (Kan. Mar. 10, 1999).

wounds. He was shot at approximately 5 p.m. in an alley behind 2938 Hiawatha in Kansas City, Kansas. The State hypothesized that Laster believed Moore had stolen his car the night before and wanted to kill Moore or have him killed in revenge.

A forensic firearms examiner testified that nine shell casings recovered from the murder scene were all 9mm and all were fired from the same gun. Five fired bullets and a bullet fragment also were recovered. The fragment yielded no information. The five fired bullets were all 9mm and all were fired from the same gun. He could neither rule out nor confirm that the shell casings and the fired bullets were from the same gun.

Seven trial witnesses, including codefendants Laster and Harris, testified that they were in the vicinity and saw the shooting or heard gunshots. Harris and Laster both denied any involvement in or prior knowledge of the shooting, and each exonerated the other of involvement.

At approximately 9:20 a.m. on August 23, 1996, a police officer found a car stripped of its tires and wheels and with a damaged steering column and a broken rear window. It was a 2-door Chevrolet Monte Carlo. A bill of sale in the glove compartment bore the name Code Laster.

Laster testified that his car had broken down the night before and that he had paid to have it towed to his mother's house at 3018 Hiawatha. Once there, he saw Moore, who lived in the 3000 block of Hiawatha and whom Laster had known all his life. Moore was a mechanic; he worked at Pete's Auto at 18th and Quindaro. Moore looked at the car, said that it needed a new starter, and told Laster to get a starter and meet him there at 8 o'clock in the morning.

Laster did not get up until approximately 10:30 the next morning, August 23. He and his cousin, Kevin Bauswell, went to an auto parts store, bought a starter, stopped for some lunch, and then went to Moore's mother's house to see if Moore was there. No one was home. They went by Pete's Auto and asked about Moore, but he was not there. Before noon, they went to Laster's mother's house where Laster learned that his car had been stolen.

Laster went to the tow lot, where his car had been taken and where he saw that the Dayton wheels were missing. He then went to see his insurance agent. He got back to his house between noon and 1 p.m. Harris was there. Laster and Harris were cousins and friends, and they spent a lot of time together. When they later left the house, they were together in Harris' car, a white over light blue 4-door General Motors car. Laster was driving, and they were going

-2-

to Laster's mother's house.

An acquaintance they knew as Terrock flagged them down and asked for a ride to 18th Street. Terrock got in behind Harris, and they drove to 18th and Quindaro. Near there, they pulled into an alley because the car was overheating. When they got out of the car, Terrock took off his shirt, revealing tattoos on his arm and chest, and had a gun at his waist. Laster and Harris testified that they were not aware until then that Terrock had a gun. Terrock put his shirt on his head and went off on foot by himself.

Laster testified that he and Harris started off on foot toward Laster's mother's house. They talked to Harold Jerome Harrison. Laster asked if Harrison had seen Moore because, although he did not think Moore had stolen his car, Laster wanted to ask Moore if he had seen anyone else around it. Harris went back to his car to roll up the windows, and Laster walked on down the alley. He saw Moore behind Chris Williams' house, and Moore greeted him. As Laster was about to ask Moore about his car, Terrock ran up, pulled his gun, and started shooting. Laster turned, saw Harris at the end of the alley, and ran.

Harris testified that he returned to his car, rolled up the windows, locked the car, and then followed Laster. As he walked to the entrance of the alley behind Chris' house, he could see Chris, Moore, Laster, and some other people. He saw Terrock run up the alley from Hiawatha and begin shooting. Harris did not have a gun, and he saw no one but Terrock with a gun. He heard two to three shots and saw Laster run, and he ran too.

Harrison, who worked as a janitor at Pete's Auto, knew Laster and knew Harris, not by name but knew his face. Harrison testified that on the afternoon of August 23 he was intoxicated from drinking beer and he also had been "smoking weed." He first saw Laster on August 23 between 2 and 4 p.m. Laster arrived at Pete's Auto driving a brown over cream car with Dayton wheels. His cousin Byron and another man, whom Harrison did not know, were with Laster. Laster asked Harrison if he had seen Paul Moore, and Harrison said Moore had gone up the alley. Five to 10 minutes later, Harrison saw Laster again. The second time, Laster was in a different car, a gray 4-door. Laster was driving, and there were three other people in the car, including Harris, who was in the front passenger seat. Harrison had never seen either of the back seat passengers before. All four got out of the car, and Laster again asked Harrison if he had seen Moore. Harrison testified that he and Moore had just walked through the alley together. He told Laster that Moore had just gone to his house.

Harrison, in a statement given to police, had said that he did not see any weapons on Laster or the three passengers. At trial, he first testified that Harris had a tattoo on his right forearm and had a gun. Then he testified that Harris had neither a tattoo nor a gun; in fact, he did not even remember Harris being there. He testified that a tattooed man with a "[do] rag" had a gun. Later, Harrison heard gunshots.

Willis Williams lives at 2938 Hiawatha with his mother and his brother, Chris Williams. Moore was shot in the alley behind their house. On August 23, Willis Williams was working on a driveway for someone else who lived on his block. He heard gunshots, turned around, and saw a man standing over Moore, shooting him. The gunman was medium brown-skinned with a tattoo on the right side of his body and a shirt over the back of his head. Approximately 5 minutes earlier, he had seen two people, neither of whom was the gunman, walk past him in the alley.

Chris Williams, in the late afternoon of August 23, was installing a radio in a blue Honda for a woman named Audrey. The car was parked beside the driveway on the side of his house. Paul Moore came by and said somebody was looking for him about a car. Sometime later, two men, both looking angry, approached from the alley. One of the men was Laster. Williams did not recognize the other man, who was brown-skinned, stocky, with long Afro hair, no shirt, and a tattoo on his right arm. Harris was not there. As the two men approached, Moore asked, "What's up?" and the tattooed man began shooting at Moore with a large handgun. Williams immediately ran. Of the six to eight shots he heard, Williams saw only who fired the first shot. He did not see whether Laster had a gun.

D.P., a 13-year-old boy whose house is near the Williams' house, testified that on the morning of August 23 he heard from his bedroom somebody putting on their brakes. Looking out, D.P. saw Laster's car. He did not see who was in the car, nor did he recognize the person's voice. He testified that he knew Laster and Harris. In the afternoon, as he was walking home through the alley with his friend, M.S., he saw two men he could not identify walking in the alley. He also noticed that there was a blue car parked behind the Williams' house with the hood up, with a woman and Moore near it. D.P. and M.S. went around to the front of D.P.'s house, and, when they were on the front porch, D.P. heard approximately six gunshots.

The State introduced evidence that D.P. had given a statement to police in which he said that prior to the murder, Laster and Harris had been driving around the neighborhood looking for Moore. D.P. told police that

-4-

Laster said he was going to get Moore for stealing his
Monte Carlo. D.P. also told police that he saw Laster and
Harris in the alley before the shooting.

M.S., an 11-year-old, lived in the 3000 block of
Hiawatha at the time of the murder. He knew Moore, he knew
Laster, and he knew Harris as Laster's friend. Sometime
earlier that day, on August 23, M.S. saw Laster driving his
car, which M.S. described as peach colored and which had
Dayton wheels. Laster approached M.S. and said he was
looking for Moore because Moore had stolen his car and he
was going to kill him. Laster had a gun, which M.S. called
a "nine," on the side of his hip. M.S. testified that he
did not think there was anyone with Laster at that time.
Later in the day, M.S. and D.P. were walking to D.P.'s
house. M.S. first testified that he saw Laster and Harris
approach through the alley and shoot Moore. He said he
thought it was Laster who shot Moore. Then he said that he
could not remember who had the gun. Later, he testified
that at the time of the shooting, he and D.P. were running
from the alley toward D.P.'s front porch so that he did not
see any shots being fired. He heard approximately six
gunshots. From the front porch, he saw Laster and Harris
running, and he saw two other men walking in the alley. A
Toyota drove up to the two unidentified men, they got in,
and they drove away.

State v. Harris, 266 Kan. 270, 271-75, 970 P.2d 519 (1998).

The Kansas Supreme Court affirmed petitioner's conviction on
direct appeal. State v. Laster, No. 97-79463 (Kan. Mar. 10,
1999)(Laster I). Petitioner then sought post-conviction relief under
K.S.A. 60-1507. The state district court denied relief, the Kansas
Court of Appeals affirmed, and the state supreme court denied review.
State v. Laster, 137 P.3d 1093 (No. 94,925)(Kan. Ct. App. July 14,
2006)(Laster II).

## II. ANALYSIS

This court's ability to consider collateral attacks on state
criminal proceedings is circumscribed by 28 U.S.C. § 2254, as amended
by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).
Under the highly deferential standard set forth in AEDPA, if

petitioner's claim has been decided on the merits in a state court, a federal habeas court may only grant relief under two circumstances: 1) if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or 2) if the state court decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

A state court decision is "contrary to" Supreme Court precedent in two circumstances: (1) when "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; or (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" that reached by the Court. Williams v. Taylor, 529 U.S. 362, 406, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court decision constitutes an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. 1495. Thus, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 120 S. Ct. 1495; see also Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000) (discussing Williams).

Finally, a state prisoner seeking habeas relief based on alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption of correctness afforded state court factual findings. See 28 U.S.C. § 2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-25 (10th Cir. 2004).

Hamilton v. Mullin, 436 F.3d 1181, 1186 (10th Cir. 2006).  An inherent limitation to review under § 2254 is that a habeas court will only consider alleged violations of federal law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80 (1991).  Moreover, the court will not normally consider federal questions unless they have first been presented to the state courts.  Picard v. Connor, 404 U.S. 270, 277-78, 92 S. Ct. 509, 513 (1971); but see 28 U.S.C. § 2254(b)(2) (permitting denial on the merits, despite failure to exhaust state remedies).

Petitioner's application in this court for federal habeas relief states five grounds for relief.  (Doc. 1).  Respondent asserts that all but two issues have not been fully exhausted in the state courts. The court will address each issue in turn.

**A.    Prosecutorial Misconduct**

Petitioner alleges that his trial was tainted by prosecutorial misconduct.  During closing argument, the prosecutor made remarks that petitioner asserts violated his due process rights.  (Br. of Pet'r in Laster I at 17.)  On review, the Kansas Supreme Court found that the comments did not violate his right to a fair trial.  "Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Miller v. Mullin, 354 F.3d 1288, 1293 (10th Cir. 2004)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  "Counsel's failure to object to . . . the comments, while not dispositive, is relevant to a fundamental fairness assessment."  Walker v. Gibson, 228 F.3d 1217, 1241 (10th Cir. 2000). In considering

a claim of prosecutorial misconduct, the court considers "the totality of the circumstances, evaluating the prosecutor's conduct in the context of the whole trial." <u>Cummings v. Evans</u>, 161 F.3d 610, 618 (10th Cir. 1998)(quotation omitted). Reviewing the strength of all the evidence, the question becomes whether the prosecutor's comments "plausibly could have tipped the scales in favor of the prosecution." <u>Id.</u> (quotation omitted).

The prosecutor made the following remark during closing argument:

> Instruction number twelve is probably the most important instruction in this entire pack, and what this instruction says is, 'If somebody aids and abets, helps and assists before or during the commission of a crime, they are just as responsible for that crime having been committed as if they committed it themselves.' And I don't dispute that there was this third guy there, and for the first time this week we hear his name Terrock.

> We hear the name Terrock, and if you remember on Tuesday when we did opening statement said something about the guy's name was Chubrock or and he was also known as Terrock. Now, Judge Boeding has instructed you that what we say is not evidence. And if you recall the evidence, the name Chubrock never has been testified to, and I'm not sure where that name came from, but it evidently is not the name of the guy that the defendants testified to because they indicated it was Terrock. So we hear this name Terrock, and I have no doubt that there was this third guy there, and this third guy was there at Code Laster and Deandre Harris' insistence. Yeah, they picked him up and they brought him there. He was the enforcer, he was Code's enforcer. And if they want to claim the oldest defense in the book that some other dude did it, we call that the Saudi defense, then I beg to differ.

<u>Laster I</u>, No. 97-79463 at 2-3.

Petitioner asserts that the prosecutor's comment that the name "Terrock" was heard for the first time during the week of trial violated his constitutional right to a fair trial because the remark implied to the jury that petitioner failed to give a statement to the police after his arrest. The Kansas Supreme Court determined that the

prosecutor improperly commented on petitioner's right to remain silent but found that the error was harmless beyond a reasonable doubt. Laster I, No. 97-79463 at 6.

"The state may not use a defendant's exercise of his right to remain silent to obtain his conviction." Jones v. Stotts, 59 F.3d 143, 146 (10th Cir. 1995) (citing Supreme Court cases). The test for determining whether a comment on the defendant's silence is impermissible is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." United States v. Mora, 845 F.2d 233, 235 (10th Cir. 1988) (same test applies whether prosecutor is commenting on defendant's post-arrest silence or his decision not to testify at trial); see also Pickens v. Gibson, 206 F.3d 988, 998 (10th Cir. 2000).

The court disagrees with the Kansas Supreme Court's determination that the prosecutor's comment can be construed as a comment on petitioner's post-arrest silence; at least it is not evident based on the portion of the argument quoted in the opinion. Perhaps the Supreme Court was aware of other parts of the record which are not quoted. In any event, the error, if it was error, was harmless. The appropriate test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Turrentine v. Mullin, 390 F.3d 1181, 1189 (10th Cir. 2004)(quoting Brecht v. Abrahamson, 507 U.S. 619, 629, 113 S. Ct. 1710, 123 L. Ed.2d 353 (1993)).   It did not.   Viewed in its most favorable light to petitioner, the prosecutor's statement only indirectly commented on petitioner's post-arrest silence by stating that she had just heard

this week about the alleged shooter.  Moreover, there was evidence that petitioner was upset with Moore and wanted him killed.  Numerous witnesses saw petitioner in the alley either moments before or after the shooting.  Accordingly, the court cannot conclude that the Kansas Supreme Court erred in determining that the prosecutor's remark was harmless and had little, if any, likelihood of changing the result at trial.  Petitioner's request for habeas relief on this ground is denied.

**B.    Ineffective Assistance of Counsel**

A claim of ineffective assistance of counsel in violation of the Sixth Amendment requires petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different.  Williams v. Taylor, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Petitioner asserts that his trial counsel was ineffective for failing to object to an instruction, failing to conduct an adequate pre-trial investigation, failing to file competent pre-trial motions and delivering an inadequate closing argument.  (Doc. 11 at 13-47).

In evaluating the performance of trial counsel, the Supreme Court provided the following guidance:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct

-10-

> falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy." See
> Michel v. Louisiana, supra, 350 U.S., at 101, 76 S. Ct., at
> 164.
>
> . . .
>
> Thus, a court deciding an actual ineffectiveness claim
> must judge the reasonableness of counsel's challenged
> conduct on the facts of the particular case, viewed as of
> the time of counsel's conduct. A convicted defendant making
> a claim of ineffective assistance must identify the acts or
> omissions of counsel that are alleged not to have been the
> result of reasonable professional judgment. The court must
> then determine whether, in light of all the circumstances,
> the identified acts or omissions were outside the wide
> range of professionally competent assistance. In making
> that determination, the court should keep in mind that
> counsel's function, as elaborated in prevailing
> professional norms, is to make the adversarial testing
> process work in the particular case. At the same time, the
> court should recognize that counsel is strongly presumed to
> have rendered adequate assistance and made all significant
> decisions in the exercise of reasonable professional
> judgment.

Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66 (emphasis

added).  Thus, under this standard, counsel's performance is presumed

competent, and petitioner bears the burden of rebutting that

presumption.

**1.  Jury Instruction**

First, petitioner asserts that his trial counsel was ineffective

for failing to object to the instruction on presumption of innocence

and burden of proof.[2]  In his brief to the Kansas Court of Appeals,

---

[2] The instruction on burden of proof and presumption of innocence
states as follows:
> The State has the burden to prove the defendant is
> guilty.  The defendant is not required to prove he is not
> guilty.  You must presume that he is not guilty until you
> are convinced from the evidence that he is guilty.
> The test you must use in determining whether the
> defendant is guilty or not guilty is this: If you have a

petitioner asserts that trial counsel failed to object to the instruction on the basis that it was vague and unclear.  In his application, however, petitioner asserts that the instruction is unconstitutional because it improperly shifted the burden to petitioner and lowered the State's burden of proof.  This argument was not presented to the state courts.  While there was a time when respondent's failure to raise the exhaustion issue would have constituted a waiver, <u>Demarest v. Price</u>, 130 F.3d 922, 934 (10th Cir. 1997), AEDPA mandates exhaustion of state remedies unless the respondent expressly waives that requirement.  28 U.S.C. § 2254(b)(3); <u>see also</u> <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1189 (10th Cir. 2002).

Since this claim was not presented to the state courts for review, a federal habeas court would ordinarily be prohibited from considering it on the merits.  <u>Picard</u>, 404 U.S. at 277-78, 92 S. Ct. at 513.  Nevertheless, if petitioner would be procedurally barred from now asserting this claim in the state courts based on independent and adequate state grounds, his claim may be considered procedurally defaulted, and therefore exhausted, for habeas purposes.  <u>Thomas v. Gibson</u>, 218 F.3d 1213, 1221 (10th Cir. 2000).  Under those circumstances, the federal habeas court will only consider petitioner's claim if petitioner can demonstrate "cause and prejudice or a fundamental miscarriage of justice."  <u>English v. Cody</u>, 146 F.3d 1257, 1259 (10th Cir. 1998).

---

reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty.  If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty.
PIK 52.02.

"A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision.  For the state ground to be adequate, it must be strictly or regularly followed and applied evenhandedly to all similar claims." Hickman v. Spears, 160 F.3d 1269, 1271 (10th Cir. 1998).  The relevant Kansas procedural rule is K.S.A. 60-1507(c), which prohibits successive motions for review.  Since petitioner already presented a motion for review under that statute, he is now barred from filing a subsequent motion.  That prohibition not withstanding, Kansas has suggested that "exceptional circumstances" might warrant successive motions; however, "[e]xceptional circumstances . . . are those unusual events or intervening changes in the law which prevented the movant from being aware of and raising all of his alleged trial errors in his first post-conviction proceeding, and they must be such that the ends of justice can only be served by reaching the merits of the subsequent application." Brooks v. State, 25 Kan. App. 2d 466, 467, 966 P.2d 686, 688 (1998) (quoting Dunlap v. State, 221 Kan. 268, 270, 559 P.2d 788 (1977)); see also Butler v. Kansas, 2002 WL 31888316, at *2 (10th Cir. Dec. 30, 2002).  There is nothing in the record that shows petitioner was precluded from raising this claim in his direct appeal.  Hence, that statute's bar against successive motions means that petitioner is now procedurally barred from raising this issue in the state system.  K.S.A. 60-1507 constitutes an independent and adequate state ground since it is a state statute generally applicable to all collateral attacks.  Therefore, this claim is procedurally defaulted, and may only be considered by this court upon a showing of cause for the default and resulting prejudice, or in order to prevent a

-13-

fundamental miscarriage of justice.

Cause for default must be something external to petitioner and his counsel, "something that cannot fairly be attributed to [them]." <u>Coleman v. Thompson</u>, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566, 115 L. Ed. 2d 640 (1991).  Petitioner has failed to allege or establish cause for failing to raise this issue on appeal.  Petitioner has also failed to allege or show any prejudice.  Because cause <u>and</u> prejudice must be shown, petitioner has not overcome the procedural default.

Finally, a fundamental miscarriage of justice in this context means that the petitioner is probably innocent of the crime.  <u>Phillips v. Ferguson</u>, 182 F.3d 769, 774 (10th Cir. 1999).  Although, the evidence against petitioner was not overwhelming, it was adequate to permit the trier of fact to convict him of the crime charged beyond a reasonable doubt.  Hence, the court finds no fundamental miscarriage of justice.   Therefore, the claim of error pertaining to the instruction will not be considered on the merits.

Petitioner's request for relief on this ground is denied.[3]

## 2.   Pretrial Investigation

Next, petitioner asserts that his trial counsel failed to adequately consult with petitioner; failed to interview the prosecution's witnesses; failed to keep petitioner apprised of the pretrial preparation; failed to conduct a pretrial investigation; failed to adequately review the prosecution's evidence; and, failed

---

[3] Despite the rather lengthy discussion regarding default, it is clear that petitioner's complaints about the instruction, and counsel's failure to object, are without merit.  The instruction, which is given in all Kansas criminal cases, correctly states the law and does not shift the burden of proof to a defendant.

to impeach the prosecution's witnesses.   (Doc. 11 at 41-42).   The district court found that petitioner's counsel had "complete access to the district attorney's file in terms of discovery and had everything he needed."   <u>Laster II</u>, No. 94,925 at 4-5.   The district court also determined that counsel went to the neighborhood of the crime scene and "it was very difficult to find anyone willing to cooperate and talk to him about the incident, and that there were not a lot of eyewitnesses to the event because it happened in an alley." <u>Id.</u>  The Kansas Court of Appeals determined that petitioner's counsel did what was reasonably expected.   The court agrees.

Petitioner has failed to allege any actual prejudice as a result of his counsel's alleged failures.   The record has established that petitioner's counsel had complete access to the case file and attempted to find additional witnesses from the scene of the murder. Petitioner has not identified any witness whose testimony would have exculpated him or otherwise aided in his defense.   The Kansas Court of Appeals' decision was not an unreasonable application of <u>Strickland</u>.

### 3.  Pretrial Motions

Petitioner alleges that his counsel was ineffective for failing to file a pretrial motion to sever the trial and failing to "file any competent pre-trial discovery motions." (Doc. 11 at 44).   The record clearly established that petitioner's counsel had full access to the state's file.   Accordingly, any allegation that petitioner's counsel should have filed any discovery motions is devoid of merit.   Moreover, Petitioner fails to allege the basis for any pretrial discovery motions that petitioner expected his counsel to file.

-15-

Petitioner next asserts that his counsel should have filed a motion to sever the trial. Petitioner states that "the facts which they both relied on to support their innocence can reasonably be deemed prejudicial to the other." (Doc. 11 at 44). The Kansas Court of Appeals stated that petitioner's counsel did not file a motion to sever because he did not believe there were any legal grounds to sever the trial. Moreover, the district court stated that petitioner's counsel "is one of the more experienced criminal trial lawyers in this part of the country, that he does a very effective job, and his judgment is usually pretty good on how to handle a case." Laster II, No. 94,925 at 5.

After a review of the testimony, the court finds petitioner's and Harris' testimony very similar. Both individuals testified that they were not involved in the shooting and that an individual named "Terrock" shot the victim. The court does not see how Harris' testimony or defense could have prejudiced petitioner. The court finds that petitioner's trial counsel's decision not to file a motion to sever amounts to a sound trial strategy and competent management of counsel's most limited resource - his time. The Kansas Court of Appeals' decision was not an unreasonable application of Strickland.

**4. Closing Argument**

Finally, petitioner asserts that his counsel was ineffective for failing to address the lack of evidence and utilizing a defective instruction in closing. The Kansas Court of Appeals determined that petitioner's counsel's closing argument adequately addressed all the pertinent issues. After a review of the closing argument, the court agrees. The Kansas Court of Appeals' decision was not an unreasonable

-16-

application of Strickland.

    Petitioner's request for relief on this ground is denied.

    **C. Exhaustion of State Remedies**

    Where, as here, the state provides an effective means to correct alleged errors in a petitioner's state criminal proceedings, AEDPA requires each petitioner to exhaust those state remedies before bringing a federal habeas petition. 28 U.S.C. § 2254(b)(1). In this case, respondent asserts that petitioner failed to exhaust three claims of error: (1) petitioner's Sixth Amendment right was violated by the state's failure to provide adequate representation of the community in the jury panel (Batson); (2) the trial court's instructions on burden of proof and presumption of innocence improperly shifted the burden of proof; and, (3) the trial court's instruction on premeditation conflicts with current Kansas law. (Doc. 11 at 9-10.) Petitioner essentially concedes that two of the three claims were not presented to the state court but asserts that it was due to ineffective appellate counsel. (Doc. 1 at 8, 11.) Petitioner asserts that his claim regarding the instruction on premeditation was presented to the state courts. (Doc. 1 at 12A.)

    In determining whether petitioner presents valid federal claims, the court will liberally construe his pro se filings. Cummings v. Evans, 161 F.3d 610 (10th Cir. 1998). On the other hand, petitioner was represented by counsel in all of his state court proceedings; thus, when considering whether he fairly presented his federal claims in the state system, no such liberal construction is warranted. Nonetheless, the court will liberally construe any pro se filings in the state system.

-17-

The court has reviewed petitioner's brief on direct appeal to the Kansas Court of Appeals, which was filed by counsel, as well as both counsel's brief and petitioner's pro se brief to the Kansas Court of Appeals on his state habeas claims.  With respect to the claims of error in the instructions, petitioner's appellate brief on collateral review asserted that his counsel was ineffective for failing to object to the instructions pertaining to premeditation, burden of proof and reasonable doubt.  Petitioner never challenged the substance of the instructions on direct review.  Petitioner did not raise the Batson issue in any of his filings.

As previously discussed, petitioner's claims are procedurally defaulted since Kansas law would prevent petitioner from filing a subsequent appeal, and petitioner's claims may only be considered by this court upon a showing of cause for the default and resulting prejudice, or in order to prevent a fundamental miscarriage of justice.

Petitioner essentially argues that his cause for default is ineffective assistance of counsel.  Ineffective assistance of counsel can be cause for procedural default, Murray v. Carrier, 477 U.S. 478, 488 (1986).  However, the court has already determined that petitioner's ineffective assistance of counsel claim pertaining to the alleged erroneous burden of proof instruction was not properly presented to the state courts and, therefore, cannot constitute "cause" for his procedural default in state court.  Sherrill v. Hargett, 184 F.3d 1172, 1176 (10th Cir. 1999).  Petitioner further asserts that his claims were not raised because his appellate counsel was ineffective.  Petitioner, however, did not raise the issue of

ineffective appellate counsel to the state courts.  Since petitioner
failed to raise this issue in the state courts, it cannot constitute
cause for his procedural default.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488
(1986)(claim for ineffective assistance of counsel cannot constitute
cause if it was not fully presented in the state courts).  Petitioner
has also failed to allege or show any prejudice.  Because cause <u>and</u>
prejudice must be shown, petitioner has not overcome the procedural
default.

Finally, the court has already determined that no fundamental
miscarriage of justice exists.  Therefore, the claims of error
pertaining to the instructions and petitioner's <u>Batson</u> challenge will
not be considered on the merits.[4]

Petitioner's request for relief on those grounds is denied.

## III.  CONCLUSION

Petitioner's application for habeas corpus is denied.  (Doc. 1).

A motion for reconsideration of this order under Local Rule 7.3
is not encouraged.  The standards governing motions to reconsider are
well established.  A motion to reconsider is appropriate where the
court has obviously misapprehended a party's position or the facts or
applicable law, or where the party produces new evidence that could
not have been obtained through the exercise of reasonable diligence.
Revisiting the issues already addressed is not the purpose of a motion
to reconsider and advancing new arguments or supporting facts which
were otherwise available for presentation when the original motion was

---

[4] As with petitioner's complaint regarding the burden of proof
instruction, <u>supra</u> at n. 3, if the court was called upon to consider
the merits of the unexhausted claims, they would be denied.

briefed or argued is inappropriate.  <u>Comeau v. Rupp</u>, 810 F. Supp. 1172
(D. Kan. 1992).  Any such motion shall not exceed three pages and
shall strictly comply with the standards enunciated by this court in
<u>Comeau v. Rupp</u>.  The response to any motion for reconsideration shall
not exceed three pages.  No reply shall be filed.

        IT IS SO ORDERED.

        Dated this  <u>  10th  </u>  day of September 2007, at Wichita, Kansas.


                                    s/ Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE